Hatch, J.
There is discovered in the record conflicting testimony, but not more so than is usually present in negligence cases, nor is it so serious in conflict as many cases of this character present. Taking the undisputed matters and the finding of the jury, the following facts must be deemed established: On Sunday morning, about nine o’clock, on August 30, 1891, plaintiff arrived at the corner of Balcom street and Harvard place, for the purpose of taking a Harvard place car, to be transported thereon to Buffalo park, where he was employed by a sewer contractor to watch tools. Hear Harvard place is situated defendant’s stables and storage sheds for its cars. The motive power upon defendant’s cars running out Harvard place at this time was electricity, applied, by means of the trolley system, to cars formerly propelled by horse power, and in no wise changed, except that the electrical machinery had been placed thereon ; but the cars themselves, in the structural part, for the carrying of passengers, remained unchanged, as did also the appliances for entering and alighting therefrom. Both the front and rear ends were open and unprotected by gates or other appliance, and presented the open ordinary step of a horse street car. On the morning in question, two cars propelled by electricity, supplied in each case by a motorman and a conductor, ran-from the storage shed onto the Main street track, and from there switched onto the Harvard place track. The surroundings were theseBetween the switch and the corner of Balcom street and Harvard place is a cross walk, nearly in front of “Sargent’s saloon,” so called, from forty to forty-five feet distant from the corner of Harvard place. Upon the last-named corner stands Stemler’s saloon, and across the street from that, on the northwesterly corner, is a greenhouse. The intervening space between Stemler’s saloon and the cross walk is a clear open place, with no obstruction to shut off the vision. Plaintiff established by five witnesses, including himself, *344 that he arrived at the corner about nine o’clock in the morning, and stopped in front of Stemler’s saloon to wait for the car; that the two cars came from the shed, and were switched onto the Harvard place track, and ran to the cross walk, where the first car stopped, the other car stopping about seven or eight feet in its rear; that the cars remained stationary three or four minutes at this point, and, while so standing, plaintiff walked from in front of Stemler’s saloon, across the open space, to the car, took hold of the iron in front of the dash hoard, on the front end of the car, placed one foot upon the first step, and, while drawing his body up, the motorman suddenly started the car, which gave a shock or jerk. Plaintiff was thrown off his balance, fell to the ground, and his legs coming between the front and rear wheels of the car, were run over by the latter, and were so injured that amputation of both feet became necessary. It was further shown, and, under instruction from the court, the jury have found, that the crosswalk where this car stopped was a place where the cars frequently stopped for the purpose of discharging and taking on passengers. The defendant gave evidence by three witnesses tending to establish that the car in question did not stop at the crosswalk on this morning, but continued in motion until after the happening of the accident; and by two witnesses, that plaintiff attempted to board the car while in motion, and, failing to secure a firm hold, was thrown under the car. As before observed, this evidence is conflicting, and the jury have negatived defendant’s contention. So far as plaintiff’s witnesses were concerned, there is little, if anything, beyond the testimony of defendant, above noted, which tends to discredit them. Three of them were former employes of defendant at the time of the accident, and two of them had voluntarily left its service after. Under what circumstances the third left the case does not disclose. All that appears is that at the trial he was not in the employ of defendant. The two witnesses first noted sat but a short distance from the place of accident, and in plain view of it. The third was the motorman of the hind car. He did not see plaintiff when approaching the car, but saw him as he was getting on; was positive the car was then stationary; saw it start; and saw plaintiff fall. The fourth witness stood in front of Stemler’s saloon, in plain view of the whole transaction. There was an attempt made to contradict the testimony of plaintiff’s witnesses, or some of them, by showing that defendant’s attorney, a short time after the accident, talked with them, and reduced their statements to writing, which were signed by them, in which they said the car was in motion when plaintiff attempted to board it * but the witness was unable to identify with certainty but one witness, Collins, who was defendant’s witness, while the written statement was not produced, and its absence was unaccounted for. There is, therefore, nothing which would justify the court in disregarding the testimony of these witnesses, or from which we can say that they are in any view discredited. Applying ordinary rules, there is a fair preponderance of testimony in favor of plaintiff’s theory.
*345 It is, however, claimed that the undisputed testimony fails to show that defendant was guilty of negligence. This claim is supported by the following suggestions: That the motorman was in his proper place, and that plaintiff gave him no sign that he desired to or contemplated taking the car; that the motorman did not in fact see plaintiff until he was in the act of falling, and that there was nothing in plaintiff’s actions prior thereto which conveyed or ought to have conveyed to the motorman’s sense that he was intending to take the car, and that as this place was not a regular stopping place for the car, and it was in fact a violation of the rules of the company to stop there, no obligation was,, therefore, imposed to look out for passengers at this place, which fact, as well as the fact that the corner where plaintiff first stood was not a regular stopping place, was, or at least ought to have-been, known to him; that the manner in which the car was-started was not shown to be negligent, or that it was done in an unusual or unskillful manner. The testimony showed that plaintiff walked from Stemler’s towards the car. The space was open. When he walked towards the car, he walked towards the motorman, and there was nothing requisite for the motorman to discover him other than to use his eyesight. Nothing distracted his attention. There was no need of a signal, as the car was stationary, and it does not appear that the motorman was making any move to start it. When plaintiff reached the car, it was motionless ; and when he took hold of the rail of the car, and stepped upon the step, he was brought to within two or three feet of the-motorman. All of these circumstances were before the jury, and upon them the court submitted the question to the jury, did the motorman see the plaintiff, or, if not, ought he, in the proper discharge of his duties, to have seen him, and known of his attempt to board the car ? It needs no argument to prove that these circumstances authorized the jury to draw the inference that a proper discharge of duty would have apprised the motorman of plaintiff’s presence and desire to take the car before it was started. The next suggestion is not supported by the testimony. Plaint-tiff’s proof tended to establish that this cross walk was a point where the cars frequently stopped, and that passengers were taken tip and left off at that point, and the motorman, Coventry, stated that he had stopped there a hundred times for that purpose, and he thought it was known to the motorman and conductor of this car; while Schabell testified that the barn boss, Phillips, ordered him to stop his car there, and this latter statement stands uncontradicted.
The court also submitted this question to the jury, and the jury negatived defendant’s claim. Whether stopping at this point was in violation of defendant’s rules was a mooted question. Two of plaintiff’s witnesses stated that it was in violation of defendant's rules to stop there, while Coventry testified that he knew of no» such rule; that it was never called to his attention; and that, in fact, at this time there were no rules for running these motor cars at that place. But, if it be conceded that stopping at this point *346 was in violation of defendant’s rule, I do not see that defendant is aided. The fact that they did stop there, and take on and let off passengers, is, as we have seen, established. If such rule existed, there is not a particle of evidence to show that plaintiff had notice of it either actually or inferentially. No proof was given to show that it was posted in a car, or in a place where passengers would be likely to see it, or any means whatever adopted to bring it to the attention of passengers. While it is doubtless true that passengers are bound to observe reasonable rules and regulations, yet, before they can be bound, therule must in some manner be called to their attention in such a way that they may know, or be chargeable with knowledge, of its existence. Railway Co. v. Wilkinson, 30 Md., 224. A continued violation of defendant’s rule by its employes, instead of being notice to a passenger that a rule is being violated, may become, on the contrary, an assurance to the passenger, upon which he may rely, that what is proper to do is being done. The fact that the car also stopped at the corner in no manner detracted from the force of the fact that it also stopped on the cross walk. It is matter of little moment whether the car was started in the usual or in an unusual manner, whether skill was used or the reverse; the vice „of the action lies in starting it at all before the passenger had reached a place of safety. It has long been the settled law that, where passengers are getting on or alighting from cars propelled by steam, to suddenly start the car, thereby endangering the safety of the person, without giving warning, is an act of negligence. Keating v. Railroad Co., 49 N. Y., .673. And this rule has been applied to street cars propelled by horses. Poulin v. Railroad Co., 61 N. Y., 621; Maher v. Railroad Co., 67 id., 55; Morrison v. Railroad Co., 130 id., 166; 41 St. Rep., 248 ; Akersloot v. Railroad Co., 131 N. Y., 599; 43 St. Rep., 290. Stronger reasons exist for applying this rule to cars propelled by electricity than to horse cars, as the motive power is more sudden and powerful in its operation. The jury were authorized to find that the act of starting threw plaintiff off, and produced the injury.
It is also argued that plaintiff was guilty of contributory negligence in attempting to board this car by the front platform. The testimony tended to establish that it had been customary for passengers to leave the cars, when propelled by horses, at either end of the car, with the sanction of those in charge. It was stated by Coventry that this custom continued after the application of ■electricity. The cars used were the same horse cars, with a different motive power. Doubtless, if a person were injured in .attempting to board or leave a car by the front platform, custom would not alone protect him; whether negligent or not would be dependent upon the surrounding circumstances. It furnishes a circumstance to enable the court and jury to find the fact; but I know of no rule of law, and am cited to no authority, holding that an attempt to board a stationary car by the front platform is negligence per se. It is doubtless competent for a jury to find that, under given circumstances, it constitutes negligence, or for *347 the court to so determine. As applied here, I think it presented a question of fact. We must bear in mind that this was a place where passengers were frequently taken on and let off. Such condition imposed upon the defendant and its agents aq active, affirmative duty to properly protect all passengers. So long as the car stood still, it was as safe to board it by the front end as the rear end. That it would so stand until plaintiff could reach a place of safety was a matter upon which he might rely. Under ■such circumstances, it would be a harsh rule to characterize his act as negligent, when his position was only rendered dangerous by the negligent act of defendant. The charge of the court, upon special request of defendant, was more favorable than it was entitled to on this point. Upon this proposition, it is sufficient now to say that, upon the evidence and the favorable charge, the jury have found for plaintiff, and the evidence and circumstances are sufficient to support their finding. Briggs v. Railway Co., 148 Mass., 72.
But one exception is urged upon our attention, and that relates to a refusal to charge. The request was: “ I ask the court to -charge the jury that the defendant is not chargeable with negligonce if the motorman started the car while the plaintiff was attempting to board it by the front platform, if he was not aware ■of the plaintiff’s presence there.”
This request was properly refused. It is seen at a glance that the request limits defendant’s liability to the knowledge, of the motorman, thus entirely excluding any consideration of the circumstances which tended to show that, if the motorman had properly discharged his duty, he ought to have known of plaintiff’s presence. Such rule, if adopted, would have permitted the motorman to have been guilty of gross dereliction of duty, whereby he placed it beyond his power of being cognizant of plaintiff’s presence, and then allege such negligence as a defense because thereby he was deprived of knowledge of plaintiff’s presence at the car. The court had already charged fully and favorably to defendant upon that proposition, and the discussion already had disposes of the question adversely to defendant. Mo other exceptions are argued, and our own examination discloses no error in any that were taken.
While the conclusion is reached that no error exists in the record, we are convinced that the damages awarded are excessive in amount. The plaintiff’s position in life is quite moderate in circumstances. He was only capable of earning eight dollars per week, as a watchman of tools used about the building of a .sewer. His age was thirty-six years, and, under the rule provided by the Northampton tables, his probable duration of life would be 12.377 years. If we assume that he would work each day for the remainder of his life upon this basis, he would possess an earning power equaling $5,863.54. Taking the earning power of this sum, as fixed by supreme court rule 71, pleasured by the probable duration of life, would produce $3,186.35. This, added to the principal sum, makes $9,049.89, as the amount which the continuous exertion of the plaintiff *348 would produce. To this must be added the expense incurred by reason of the injury, appearing in the record to be $330. This, added to the previous sum, makes a total of $9,379.89, as the amount of injury sustained so far as the same affects plaintiff’s earning power, upon the ordinary basis used in determining the value of estates. The court does not overlook that compensatory damages are not limited to the sum named, nor can they be accurately ascertained; but taking into account all the other elements-recognized by law, and being conscious of the uncertainty attendant thereon, we think that the sum of $11,620.11 for these elements is excessive in amount, measured by plaintiff’s capacity and his walk in life. We are, therefore, constrained to reduce-the recovery to the sum of $5,000, believing thereby that justice will be more nearly attained. The order will, therefore, be that-the judgment appealed from be reversed, unless the plaintiff,, within ten days after the entry of the order herein, serve upon the-defendant or his attorney a written notice accepting said sum as; damages herein, in which latter event the judgment and order appealed from are affirmed, without costs to either party in this court.
Since the above was written, plaintiff’s attorney has filed with-the court a supplemental point, claiming that defendant has not appealed from the order denying the motion for a new trial, and that this court is without power to review the facts. We do not-deem the point well taken. Section 1300, Code Civil Procedure, provides that an appeal must be taken by serving upon the attorney of the adverse party and the clerk with whom the judgment or order is entered a written notice to the effect that the appellant appeals from the judgment or order, etc. It seems clear that no-particular form of language is requisite. If the words used are, in effect, a notice that the order made is sought to be reviewed, it-is sufficient. The notice in this case states first the appeal' from the judgment. Then it states: “And appellant intends; to bring up for review, upon such appeal, the order dated the 25th day of October, 1892, denying defendant’s motion for a new trial herein on the judge’s minutes.” The notice specifies-, distinctly the order, and if the word “ appeal ” had been substituted for “ intends,” the notice would be strictly within the section, although happier phraseology could have been used. It is-enough to say now that the intention is apparent; plaintiff has not been misled ; and, in effect, it is a notice of appeal from the-order. The following authorities support this view. Hymes v. Van Cleef, 39 St. Rep., 810; Van Ingen v. Snyder, 24 Hun, 83. Result as heretofore indicated.